### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**CONSUELLA OLIVER and**
**PHILLIP LEROY OLIVER,**
                             :

       **Plaintiffs,**
                               **Case No. 2:22-cv-02029**
                               **Judge Sarah D. Morrison**
    **v.**
                               **Magistrate Judge Elizabeth A.**
                               **Preston Deavers**

**ETNA TOWNSHIP, OHIO,**        :

       **Defendant.**

### OPINION AND ORDER

This matter is before the Court for consideration of the Motion for Summary Judgment filed by Etna Township, Ohio (Mot., ECF No. 25). Consuella Oliver and Phillip Leroy Oliver responded (Resp., ECF No. 32), and the Township then filed its reply (Reply, ECF No. 35). Pursuant to the Court's Order (ECF No. 36), the parties also filed supplemental briefing concerning certain standing and ripeness inquiries (ECF Nos. 40, 41). This matter is now ripe for consideration. For the reasons set forth below, the Motion is **GRANTED**.

## I.    FACTUAL BACKGROUND

### A.    Zoning in Etna Township

Etna Township is a political subdivision located in Licking County, Ohio. Historically a rural community, the Township has over the past decade experienced "significant industrial development associated with the construction and expansion of e-commerce fulfillment centers and logistics boom occurring throughout Central

Ohio." (ECF No. 8, ¶ 19.) Census data shows that roughly 29% of the Township consists of racial minorities.[1] (Mot., PAGEID # 155.)

The Township governs its land use and development through a Zoning Resolution, which aims to "promot[e] the orderly development of residential, business, industrial, recreational, and public areas" and "provid[e] the compatibility of different land uses and the most appropriate use of land," among other objectives. (Mot., Ex. 1-A ("Resolution"), ECF No. 25-2, PAGEID # 187.) The Resolution was "enacted in accordance with" the Township's comprehensive land use plan. (*Id.*; *see generally* Mot., Ex. 1-B ("Comprehensive Plan"), ECF Nos. 25-3, 25-4.)

In 2011, the Township updated its Comprehensive Plan, intending for it to "serve as the basis and rationale for future zoning decisions that are made in this community" and "provide an overall policy guide and statement of goals for the future development of Etna Township." (Comprehensive Plan, PAGEID # 454.) The updated Comprehensive Plan sets out a "Vision Statement," which declares in relevant part:

> Etna Township, like many other unincorporated areas, has long enjoyed a proud history. The rural makeup of this community serves as the fundamental basis for the strong desire within Etna Township to maintain as much of that history as possible … Etna Township has been at the threshold of this urban growth for well over a decade … If this trend continues, the rural nature of Etna Township will fade. This plan seeks to properly plan for future growth to make sure that doesn't happen. The residents of Etna Township treasure its rural heritage and seek to maintain it far into the future.

---

[1] "Courts may take judicial notice of government statistics such as United States census data[.]" *United States v. Neal*, 577 F. App'x 434, 452 (6th Cir. 2014) (citation omitted); *see also* Fed. R. Evid. 201.

(*Id.*, PAGEID # 495.) With the Comprehensive Plan, "Etna Township leaders hope to mitigate the effects of future development on the township while maintaining the rural and agricultural nature that community residents want to protect." (*Id.*, PAGEID # 453.)

Multi-family housing in the Township "has been the subject of much debate[.]" (Comprehensive Plan, PAGEID # 516.) According to the Comprehensive Plan, "it is widely supported that the community should provide opportunities for people who cannot or do not want to own a single-family home," and "the need to provide housing for younger adults, empty nesters, students and other people who want to live in apartments or condos is important." (*Id.*) However, the Comprehensive Plan also expresses that:

> There is concern among the planning committee that establishing multi-family districts within Etna Township will perpetuate a culture of crime and unwanted behavior that allegedly accompany some types of large scale, affordable, multi-family housing units. In discussions held among committee members, it was made clear that Etna Township does not want to invite a culture in the community that is anything less than the respectful, law abiding, friendly variety these residents have enjoyed in Etna Township for years. The inclusion of multi-family housing must be done in a manner that accommodates people whose lifestyles warrant apartments, but that also minimizes potential undesirable behavior.

(*Id.*, PAGEID # 516–17.) The Comprehensive Plan identifies areas on the west side of the Township "acceptable for multi-family development." (*Id.*, PAGEID # 517, 564–65.)

In late 2013, the Township amended the Resolution to remove the Medium Density Residential ("R-3") District classification, which permitted multi-family

residential dwellings. (Compl., Ex. C, ECF No. 1-1, PAGEID # 27.) As a result, there are no longer any districts in the Township that are "straight zoned" to allow multi-family residential dwellings as a use category, although multi-family dwellings are permitted "in special districts like Planned Mixed Unit Developments." (Mot., Ex. 1-F ("BZA Minutes"), ECF No. 25-8, PAGEID # 596.)

Property owners may petition the Township's Board of Zoning Appeals ("BZA") to "authorize … use variances from" the Resolution that align with public interest "where strict application of [the Resolution] would result in unnecessary hardship." (Resolution, § 513(B), PAGEID # 217.) For a property owner to prove unnecessary hardship, there are eight prongs that the BZA must find "to be accurate through clear and convincing evidence." (*Id.*) Although property owners must satisfy all eight prongs to justify a use variance, the BZA may give more weight to certain prongs over others. (BZA Minutes, PAGEID # 597.) The pertinent prongs in the instant case are (1) "The property cannot be put to any economically viable use under any of the permitted uses in the zoning district"; and (6) "The variance will be consistent with the general spirit and intent of the Zoning Code." (Resolution, § 513(B)(1)–(8), PAGEID # 217.)

### B.    Plaintiffs' Property and Zoning Efforts

Since 2009, Plaintiffs have owned a parcel of real property in Etna Township located at 9616 Mink Street SW ("the Property"). (Mot., Ex. 1 ("Singleton Aff."), ECF No. 25-1, PAGEID # 172.) A single-family residential dwelling built in or around 1953 sits on the Property. (*Id.*; Mot., Ex. 1-D ("Variance App."), ECF No. 25-6,

PAGEID # 578.) The portion of Mink Street near the Property is predominately composed of single-family residences. (BZA Minutes, PAGEID # 596.)

Township voters approved the use of zoning authority in 1960. (Comprehensive Plan, PAGEID # 460.) Since that time, the Property and all surrounding parcels have been zoned in the General Business ("GB-1") District. (Singleton Aff., PAGEID # 172–74.) The GB-1 District is a business-use zoning classification that has numerous permitted land uses. (Resolution, § 907, PAGEID # 255–66.) But the GB-1 District does not currently permit—and has not at any point during Plaintiffs' ownership of the Property permitted—multi-family residential dwellings. (Singleton Aff., PAGEID # 173.)

Plaintiffs wish to construct a multi-family development on the Property containing a maximum of 20 living units across three buildings (the "Development"). (Variance App., PAGEID # 575, 577.) Knowing that the GB-1 District prohibits multi-family residences and that the R-3 classification had been removed from the Resolution, Plaintiffs filed an Application for Zoning Amendment ("Zoning Application") to re-zone the Property to the R-2 District, a single-family residential district with a smaller density limitation. (Mot., Ex. 1-C ("Zoning App."), ECF No. 25-5, *generally*.) Plaintiffs concurrently filed an Application for Use Variance ("Variance Application") to permit them to build the Development in either their existing GB-1 District (should the Zoning Application be denied) or the R-2 District (should the Zoning Application be approved). (Variance App., *generally*.)

The Etna Township Zoning Commission met and heard the Zoning

Application.[2] (ECF No. 8, ¶ 27.) In support of their application, Plaintiffs argued

that the Development would "provide[] a desired land use" and "match[] the goals"

of the Comprehensive Plan "by diversifying the makeup of land use in the

community and providing medium to high density housing desired by local

businesses." (Zoning App., PAGEID # 568–69.) At the end of the hearing, the Zoning

Commission tabled its decision so it could hear from the Zoning Inspector on the

issue. (BZA Minutes, PAGEID # 597.) Plaintiffs subsequently withdrew their

Zoning Application before the Zoning Commission could render a final decision.

(ECF No. 40, PAGEID # 697–98; ECF No. 41, PAGEID # 711; *see also* ECF No. 40-2

(Meeting Minutes, Etna Township Zoning Commission (Oct. 26, 2021)).)

Two weeks after the Zoning Commission hearing, the BZA met and heard the

Variance Application. (BZA Minutes, *generally*.) Plaintiffs presented similar

testimony and evidence to the BZA as they had provided to the Zoning Commission,

along with additional material going toward the "unnecessary hardship" standard.

(*Id.*, PAGEID # 596–97.) Plaintiffs emphasized that multi-family residential "is the

highest and best use of the Property" and that "[g]eneral business uses are

---

[2] Prior to the hearing, the Zoning Commission applied to the Licking County
Planning Commission for a non-binding recommendation on the Zoning Application.
(Mot., Ex. 1-E, ECF No. 25-7, PAGEID # 582.) The Planning Commission
recommended that the Zoning Commission deny the Zoning Application because re-
zoning would "not be in conformance with" the Comprehensive Plan's designation of
the area as commercial and because there were no neighboring properties zoned in
the R-2 District. (*Id.*, PAGEID # 584.)

6

incompatible with adjacent properties and not economically viable" due to the location and shape of the Property. (Variance App., PAGEID # 577.)

During the hearing, the BZA observed that "there are four hundred and fifty uses in the General Business District and there are uses that would be profitable for this property." (BZA Minutes, PAGEID # 597.) When asked whether certain of those uses would be economically viable uses, Plaintiffs responded that "[t]his property is not a viable site for commercial use." (*Id.*) At the end of the hearing and upon consideration of the eight unnecessary hardship prongs, the BZA denied the Variance Application. (*Id.*)

## II.  PROCEDURAL HISTORY

Plaintiffs, who are African American, filed suit against the Township in April 2022, alleging that the Township "makes its zoning/land use and planning decisions and actions using unlawful bigoted, racist, and classist ideals and beliefs." (Compl. ¶ 34.) They assert that "[r]acial minorities make up a disproportionate share of lower income households that rely on more affordable and diverse housing types." (*Id.* ¶ 37.) Thus, Plaintiffs reason, "the purposeful removal of options for affordable multi-family housing in Etna Township disproportionately affects racial minorities." (Resp., PAGEID # 635.) Plaintiffs conclude that the Township acted unconstitutionally by removing the R-3 multi-family classification from the Resolution and by refusing to allow them to construct the Development. (*Id.*, PAGEID # 640–41.)

Plaintiffs bring several causes of action stemming from the zoning of the Property:

- Violation of the Fair Housing Act of 1968 (the "FHA");
- Violation of Substantive Due Process (42 U.S.C. § 1983);
- Violation of Equal Protection (42 U.S.C. § 1983);
- Regulatory Taking (42 U.S.C. § 1983);
- Due Process Taking (42 U.S.C. § 1983); and
- Violation of the Ohio Constitution, Article I, Section 19.

(Compl., ¶¶ 40–91.) Plaintiffs also request (1) a declaratory judgment that the Township's acts of zoning the Property in the GB-1 District, removing the R-3 classification, and denying the Zoning and Variance Applications are unconstitutional; (2) a writ of mandamus ordering the Township to commence appropriation proceedings against the Property and/or amend the Resolution to allow the Property to be developed for multi-family residential use; and (3) corresponding injunctive relief and damages. (*Id.* ¶¶ 92–104, Prayer for Relief.)

The Township now seeks summary judgment on all claims.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed

in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## IV. ANALYSIS

Before the Court considers the merits of the parties' arguments, it must address certain threshold issues of ripeness and standing.

### A. Ripeness

Article III limits "federal courts to hear only actual cases and controversies." *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). A claim must be ripe for a federal court to have subject matter jurisdiction. *Doe v. Oberlin Coll.*, 60 F.4th 345, 355 (6th Cir. 2023); *Wedgewood Ltd. P'ship I. v. Twp. of Liberty, Ohio*, 456 F. Supp. 2d 904, 918 (S.D. Ohio 2006) (Marbley, J.). "A claim is unripe when 'it rests upon contingent future events that may not occur as anticipated or indeed may not occur at all.'" *Cath. Healthcare Int'l, Inc. v. Genoa Charter Twp.*, 82 F.4th 442, 448 (6th Cir. 2023) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

### 1. Regulatory Takings Claim

Among other causes of action, Plaintiffs assert a regulatory takings claim based primarily on the Township's "denial of Plaintiffs['] re-zoning application and use variance application." (Compl. ¶¶ 71–77.) "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180 (2019). In other words, "Fifth Amendment takings claims do not ripen in zoning cases until … there has been a final decision by the relevant state decision-maker." *Wedgewood*, 456 F. Supp. 2d at 920; *see also Cath. Healthcare*, 82 F.4th at 448 (internal quotations and citation omitted) ("In land-use cases, the necessary event is simply that the government has adopted a definitive position as to how the regulations at issue apply to the particular land in question.").

Here, Plaintiffs received a final decision from the BZA with respect to their Variance Application, such that their regulatory takings claim is ripe as to that decision. (BZA Minutes, PAGEID # 597.) However, Plaintiffs withdrew their Zoning Application before the Zoning Commission could render a final decision. Because the Township never "adopted a definitive position" as to how the Property would be zoned, Plaintiffs' regulatory takings claim is not ripe to the extent it challenges the non-existent "denial" of the Zoning Application.

Plaintiffs argue that their "request for re-zoning became a futility upon [the Township's] wrongful denial of Plaintiffs' application for a use variance" because the Zoning Application "would not, by itself, have allowed Plaintiffs to move forward" with the Development. (ECF No. 41, PAGEID # 711.) Although the futility exception to the finality requirement applies when parties have reached an "impasse" and further proceedings "would not be productive," *Lilly Invs. v. City of Rochester,* 674 F. App'x 523, 527 (6th Cir. 2017) (quoting *Bannum, Inc. v. City of Louisville,* 958 F.2d 1354, 1362–63 (6th Cir. 1992)), it does not save Plaintiffs' claim here. That the Zoning Commission would have denied the Zoning Application is not a foregone conclusion. Even though a grant of the Zoning Application would not, standing alone, have permitted the Development, it could still have been productive in that it would have created new use options for the Property that could have changed the Court's analysis.

## 2. Other Constitutional Claims

The Sixth Circuit has extended the finality requirement "beyond claims of regulatory takings to various other constitutional claims arising out of land use disputes." *Insomnia Inc. v. City of Memphis*, 278 F. App'x 609, 613 (6th Cir. 2008). In this case, Plaintiffs' substantive due process, equal protection, and due process takings claims are ancillary to their regulatory takings claim and based in part on the Township's denial of their Zoning Application.[3] (Compl. ¶¶ 57, 68, 82.) Courts

---

[3] Plaintiffs also assert a claim under the Ohio Constitution. (Compl. ¶¶ 86–91.) This claim is "governed by essentially the same standards as those applicable to Plaintiff's federal constitutional claims." *Wedgewood*, 456 F. Supp. 2d at 939 (citing *Warren v. City of Athens, Ohio*, 411 F.3d 697, 704, n.6 (6th Cir. 2005)).

consistently subject equal protection claims to the finality requirement. *See Bigelow v. Michigan Dep't of Nat. Res.*, 970 F.2d 154, 159 (6th Cir. 1992); *Wedgewood*, 456 F. Supp. 2d at 922. Additionally, because they are not purely procedural grievances, Plaintiffs' substantive due process and due process takings claims are also subject to the finality requirement. *See Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 893–94 (6th Cir. 1991) (observing "a vital distinction between procedural due process claims and other varieties of constitutional grievances stemming from land use decisions"); *Monfort Supply Co. v. Hamilton Cnty. Bd. of Zoning Appeals*, No. 1:04-cv-145, 2006 WL 3692533, at *9 (S.D. Ohio Dec. 12, 2006) (Watson, J.); *Bigelow*, 970 F.2d at 159–60.

Accordingly, to the extent Plaintiffs' constitutional claims are founded on the Township's actions with respect to the Zoning Application, those claims are not ripe for review.[4]

## B. Standing

Standing is necessary to the exercise of jurisdiction and "determin[es] the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "If no plaintiff has standing, then the court lacks subject-matter jurisdiction." *Tennessee Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019). "Once standing concerns arise—whether raised by defendants, or *sua sponte* by the

---

[4] In any event, Plaintiffs admit that "re-zoning itself was not strictly necessary" and that their "claims in this case are not based on [the Township's] refusal to re-zone their property from a commercial to single-family residential classification." (ECF No. 41, PAGEID # 712.)

Court in meeting its obligation to ensure its own jurisdiction—Plaintiffs carry the burden to establish that standing requirements are met." *Solis v. Emery Fed. Credit Union*, 459 F. Supp. 3d 981, 988 (S.D. Ohio 2020) (Cole, J.) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

There are two "related but distinct inquiries" when analyzing a plaintiff's standing to bring most claims. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 348 (6th Cir. 2007). As to the first inquiry, a plaintiff must establish constitutional (Article III) standing and show "(1) that they have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[;] (2) that a causal link exists between the injury and the conduct complained of, ... [;] and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Midwest Media Prop., LLC v. Symmes Twp., Ohio*, 503 F.3d 456, 461 (6th Cir. 2007) (internal quotations and citations omitted).

The second standing inquiry concerns prudential standing, which is a judicially created doctrine relied on as a tool of "judicial self-governance." *Warth*, 422 U.S. at 500. Prudential standing requires that a "plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475 (1982) (quotations and citations omitted). Prudential standing precludes federal litigation "when the asserted harm is a 'generalized grievance' shared in substantially equal

13

measure by all or a large class of citizens" or where, instead of litigating "his own legal rights and interests," the plaintiff instead purports to "rest his claim to relief on the legal rights or interests of third parties." *Warth*, 42 U.S. at 499 (citations omitted).

**1.    Plaintiffs do not have standing to bring claims based on the Township's removal of the R-3 District.**

Plaintiffs have not met their burden to show that they suffered an actual and redressable injury with respect to the Township's decision to remove the R-3 zoning classification from the Resolution. This failure means that they lack standing to assert their FHA claim (Count I) in its entirety, as well as their other claims to the extent those claims take issue with the removal of the R-3 District.

It is not clear whether Plaintiffs bring their FHA claim on their own behalf, on behalf of "racial minorities … who rely on more affordable housing and diverse housing types, including multi-family residential (apartments) housing," or both. (Compl. ¶ 46.) Regardless, unlike most other constitutional claims, prudential limitations on standing do not apply to actions brought under the FHA. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 375–76 (1982); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979); *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 2019 (1972). Instead, "the sole requirement for standing to sue under [the FHA] is the Art. III minima of injury in fact[.]" *Havens Realty Corp.*, 455 U.S. at 372. Thus, an FHA plaintiff has standing if she alleges that she suffered an Article III injury in fact as a result of a defendant's violation of *someone's* FHA rights. *Id.* at 376 n.16 (quoting *Gladstone*, 441 U.S. at 103 n.9).

14

Looking to actual injury, Plaintiffs' FHA claim is entirely based on the Township's allegedly discriminatory elimination of the R-3 zoning category, which Plaintiffs argue harms minorities by restricting more affordable housing. (Compl. ¶ 47.) But the only injury that Plaintiffs contend *they* suffered is that the removal of the R-3 classification prevented them from building the Development after they "expended significant sums" to do so. (Compl. ¶¶ 55, 73; Resp., PAGEID # 640; Resp., Ex. 1, ECF No. 32-1, PAGEID # 652; ECF No. 41, PAGEID # 717.) But the Property was never zoned with the R-3 designation (Singleton Aff., PAGEID # 172–74), so the Township's eradication of that category had no effect on Plaintiffs or the allowed uses of the Property. Moreover, Plaintiffs' conclusory contention that they "expended significant sums" is not sufficient to meet their burden to demonstrate financial injury.

Plaintiffs also assert that they have standing because they meet the prongs of the disparate impact theory for FHA discrimination claims (ECF No. 41, PAGEID # 717)—but Plaintiffs confuse strength on the merits with Article III standing. *See Warth*, 422 U.S. at 500 ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."); *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 1117 (2020) ("There is a difference between failing to establish the elements of a cause of action and failing to show an Article III injury. One is a failure of proof. The other is a failure of jurisdiction. Yes, there can be overlap between the two inquiries. But they are not one and the same.").

Plaintiffs also neglect to show redressability. They seek "an injunction ordering the Township to approve Plaintiff's rezoning application, compensatory damages," and fees and costs. (Compl. ¶ 49.) But as Plaintiffs acknowledge, rezoning to the R-2 District classification "would not, by itself, have allowed Plaintiffs to move forward with the low-density multi-family residential development that they have proposed for their property." (ECF No. 41, PAGEID # 711–12.) Plaintiffs have put forth no evidence that a favorable decision would remedy their claimed injury.

Therefore, the Township is entitled to summary judgment on Count I.

### 2. Plaintiffs have standing for claims related to the Township's denial of their Variance Application.

It is undisputed that Plaintiffs suffered an "actual injury" when the Township denied their Variance Application. (ECF No. 40, PAGEID # 703); *see, e.g.*, *Wedgewood*, 456 F. Supp. 2d at 927. Plaintiffs therefore may bring their remaining claims to the extent their claims on their own behalf concern the Variance Application.

But Plaintiffs also bring their equal protection claim on behalf of "[f]uture residents of the proposed multi-family residential units Plaintiffs seek to develop." (Compl. ¶ 62.) "[A] party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (internal quotations and citation omitted); *see also Obergefell v. Wymyslo*, 980 F. Supp. 2d 907, 913 (S.D. Ohio 2013) (Black, J.) (quoting *Singleton v. Wulff*, 428 U.S. 106, 114 (1976)) ("Ordinarily, one

16

may not claim standing … to vindicate the constitutional rights of some third party."). Nevertheless, some courts have recognized that a developer may have third-party standing to assert a § 1983 claim to remedy discrimination based on the race of the persons likely to live in the proposed development. *See, e.g.*, *Blue Water Fin. Co. v. City of Lansing*, No. 5:97-cv-200, 1998 WL 278187, at *5 (W.D. Mich. Mar. 10, 1998) (observing Sixth Circuit position that white plaintiff has standing to assert § 1981 action for retaliation against support of minorities and extending standing to § 1983 cases based on similarity of purpose between statutes); *In re Malone*, 592 F. Supp. 1135, 1155 (E.D. Mo. 1984), *aff'd sub nom. Malone v. City of Fenton*, 794 F.2d 680 (8th Cir. 1986) (finding developer had standing to raise both their own rights and rights of minorities who allegedly were adversely affected by defendant's action); *see also Farmer v. City of Cincinnati*, No. 1:04-cv-080, 2006 WL 3762131, at *7 (S.D. Ohio Dec. 21, 2006) (Dlott, J.) (citing cases). Although the Township argues that Plaintiffs lack standing to claim that its denial of the Variance Application violated future tenants' equal protection rights, the Court is cognizant of the above-cited case law and will assume, without affirmatively deciding, that standing exists because, as detailed below, Plaintiffs' claim on behalf of future tenants fails on the merits.

### C.    Merits Analysis

The Township is entitled to summary judgment on Plaintiffs' enduring claims based on the denial of their Variance Application. For ease of analysis, the Court discusses the claims out of order.

### 1. Equal Protection Claim (Count III)

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying any person within its jurisdiction equal protection of the law. U.S. Const. amend. XIV. States cannot make distinctions that "(1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly-situated without any rational basis." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (citation omitted). Plaintiffs in this case allege all three circumstances. They argue that by "block[ing] the development of more affordable housing and apartment developments," the Township has subjected them to "disparate treatment as compared to other similarly situated property owners." (Compl. ¶¶ 64–65.) This disparate treatment, Plaintiffs contend, burdens a fundamental property right, targets a suspect class, and has no rational basis. (*Id.* ¶¶ 67, 70.)

### a) Fundamental Right

"A fundamental right is one that is protected by some other provision of the United States Constitution." *St. Paul's Protestant Episcopal Church v. City of Oakwood*, No. C-3-88-230, 1998 WL 1657172, at *7 n.20 (S.D. Ohio Mar. 3, 1998) (Rice, J.) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). The right to build a multi-family living complex is not a protected fundamental right. *See id*; *see also Frazier v. City of Grand Ledge, MI*, 135 F. Supp. 2d 845, 852 (W.D. Mich. 2001) ("[A] person does not have a fundamental right to use property or have it zoned any way he or she wishes.").

18

### b) Suspect Class

Plaintiffs assert that, as African Americans, they are members of a suspect class and that future residents of the proposed Development are likely also members of a suspect class.[5] (*Id.* ¶¶61–62.) To state a claim under the "suspect class" section of the Equal Protection Clause, Plaintiffs must allege that the Township intentionally discriminated because of membership in a protected class. *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1111 (6th Cir. 1995); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). Plaintiffs need not show that the challenged action rested solely on discriminatory purposes but rather that a discriminatory purpose was a "motivating factor" in the decision. *Arlington Heights*, 429 U.S. at 265.

Determining whether invidious discriminatory purpose was a motivating factor "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* The Supreme Court in *Arlington Heights* articulated a non-exhaustive, multi-factored test for determining whether official action was motivated by discriminatory intent. *Id.* at 266–68. These factors include: (1) the

---

[5] Plaintiffs do not articulate *which* suspect class would encompass future residents. Although Plaintiffs denounce the Township's zoning actions as limiting the amount of "affordable housing" options within the Township (Compl., ¶¶ 35, 64), low income is not a protected class. *See Maher v. Roe*, 432 U.S. 464, 471 (1977) ("[T]his Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis."). Taking the Complaint as a whole, the Court assumes Plaintiffs believe future residents could be members of a suspect class due primarily to their race. (*See, e.g.*, Compl. ¶ 47 (asserting "a discriminatory impact on racial minorities").)

racial impact of the decision; (2) the historical background of the decision, particularly where it reveals a series of official actions taken for invidious purposes; (3) the specific sequence of events leading up to the challenged decision, including departures from the normal procedural sequence or substantive criteria; and (4) the legislative or administrative history (i.e., contemporary statements by members of the decision-making body, or minutes of its meetings). *Id.*

The *Arlington Heights* factors belie Plaintiffs' claim of discriminatory intent. Looking first to racial impact, the Township's decision to deny Plaintiffs' Variance Application does "bear[] more heavily on one race than another," but only to the extent Plaintiffs are African American. *Arlington Heights*, 429 U.S. at 266. There is no indication, however, that the Township denied Plaintiffs their requested use *because of* their race, or even considered their race at all.

Plaintiffs point to data from 2018 and 2019 showing that racial minorities "have incomes substantially below those of the majority" and corresponding lower rates of homeownership. (Resp., PAGEID # 635; Compl. ¶ 36.) From this generalized data, Plaintiffs ask the Court to find that there is a "strong causal connection" between the lack of affordable multi-family housing in the Township and a lower number of minorities able to live there. (Resp., PAGEID # 635.) This is too much of an inferential leap. The data implies but does not affirmatively indicate the extent to which minorities "rely on more affordable and diverse housing types" like multi-family housing. (Compl. ¶ 37.) It also does not speak to the impact the Township's denial of Plaintiffs' Variance Application would have on minority

residents there. Indeed, the record is devoid of concrete evidence showing that the denial of the Variance Application negatively impacted anyone other than Plaintiffs.

The other *Arlington Heights* factors also weigh against a finding of discriminatory purpose. *See Arlington Heights*, 429 U.S. at 266 ("[I]mpact alone is not determinative[.]"). The Court agrees with Plaintiffs that the second prong (historical background) "is not a factor that cuts either way in this case." (Resp., PAGEID # 635.)

As to the third prong (sequence of events), nothing indicates that the Township departed from its normal procedural sequence or substantive criteria in denying Plaintiffs' Variance Application. The evidence reflects that the BZA reviewed the area around the Property, the Comprehensive Plan, the Resolution, and other standard substantive criteria. (BZA Minutes, *generally*.) There is no evidence that the BZA considered Plaintiffs' race. Rather, the BZA minutes indicate that it followed its usual procedure. (*Id*.) Plaintiffs' suggestion that the Township "feign[ed] an inability to grant use variances" is not supported by the evidence. (Resp., PAGEID # 638.)

Finally, looking to the fourth prong (administrative history), Plaintiffs argue that the Comprehensive Plan is "evidence of [the Township's] discriminatory intent." (Compl. ¶¶ 44, 63.) They point to the following language:

> There is concern among the planning committee that establishing multi-family districts within Etna Township will perpetuate a *culture of crime and unwanted behavior* that allegedly accompany some types of large scale, affordable, multi-family housing units. In discussions held among committee members, it was made clear that *Etna Township does not want to invite a culture in the community that is*

21

*anything less than the respectful, law abiding, friendly variety* these residents have enjoyed in Etna Township for years.

(*Id.* ¶ 34 (emphasis in original) (quoting Comprehensive Plan, PAGEID # 516–17); *see also* Resp., PAGEID # 640.) According to Plaintiffs, these statements are "thinly veiled bigoted, racist, and classist statements regarding multi-family residential units and the kinds of people that would reside in them." (Compl. ¶ 63; Resp., PAGEID # 634.)

In support of their position, Plaintiffs rely on the Sixth Circuit's decision in *Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 263 F.3d 627 (6th Cir. 2001), in which the court examined the administrative record that included comments from various sources at multiple city meetings about "crime" and "social engineering," negative comparisons with a majority African American community, and references to "ghettos." *Id.* at 631, 641. The *Buckeye* court concluded that these statements could imply racial bias or stereotypes, such that the lower court erred in dismissing the claim on summary judgment. *Id.* at 639.[6] But the statements in the Township's Comprehensive Plan are significantly different than the statements in *Buckeye*, the latter of which explicitly referenced "ghettos" and other racially

---

[6] The Township correctly notes that the Supreme Court reversed in part and vacated in part the Sixth Circuit's decision. *See City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188 (2003). However, the Township incorrectly asserts that the Supreme Court rejected the Sixth Circuit's holding that the statements could imply racial bias. (Reply, PAGEID # 687.) The Supreme Court did not comment on the character of the statements—rather, the Supreme Court invalidated the Sixth Circuit's reliance on the statements in finding a genuine issue of material fact as to discriminatory intent, as they were made by private citizens and could not be attributed to the state actors. *Buckeye*, 538 U.S. at 197. Here, the Comprehensive Plan was prepared by state actors (the Licking County Planning Commission and Etna Township staff). (Comprehensive Plan, PAGEID # 449.)

charged concepts. *Id.* at 636. Plaintiffs have not cited to any other language in the Comprehensive Plan or racially biased beliefs expressed during zoning meetings on behalf of the Township. Thus, Plaintiffs also cannot demonstrate the fourth *Arlington Heights* criterion and have failed to carry their burden of proving that the Township was targeting a suspect class.

### c) Differential Treatment

Because the zoning in this case does not adversely impact a suspect class or invade a fundamental right, the Court will test the Township's zoning measures using the rational basis standard. *Mount Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 406 (6th Cir. 1999). In this regard, Plaintiffs face an "uphill climb." *In re City of Detroit*, 841 F.3d 684, 701 (6th Cir. 2016). "[G]overnmental policy has a 'strong presumption of validity' and will be upheld 'if there is a rational relationship between the disparity of treatment and some legitimate government purpose.'" *EJS Properties, LLC v. City of Toledo*, 651 F. Supp. 2d 743, 757 (N.D. Ohio 2009), *aff'd in part*, 698 F.3d 845 (6th Cir. 2012) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). To prevail, Plaintiffs must show the Township's denial of the Variance Application does not advance any legitimate purpose. *Id.*

Here, Plaintiffs have not demonstrated that the Township treated them differently than similarly situated individuals. *See, e.g.*, *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1037 (6th Cir. 1992). Plaintiffs provide no evidence that the Township permitted a use variance for the development of multi-family residential dwellings on another parcel similarly situated to theirs.

23

Interestingly, Plaintiffs contend that they were treated differently than other similarly situated property owners, while also asserting that the Township has not approved any multi-family housing since 2011. (*Compare* Compl. ¶¶ 65–66, *with* Resp., PAGEID # 633). Plaintiffs cannot have it both ways.

What's more, the Township has identified its interests in "minimizing urban development," "promoting ruralness," and preserving "a rural, quiet way of life for Township residents removed from urbanization." (Mot., PAGEID # 166–67 (citing Comprehensive Plan).) Courts consistently find similar government interests to be legitimate. *See, e.g.*, *Arlington Heights*, 429 U.S. at 269–70 (finding denial of building permit for multi-family low-income housing in accordance with rational zoning scheme); *Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 9 (1974) ("A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs."); *White Oak Prop. Dev., LLC v. Washington Twp., Ohio*, 606 F.3d 842, 853 (6th Cir. 2010) (zoning resolution goal of "assisting [in] the preservation of open space, unique natural resources and natural terrain features … is a legitimate land use goal, and the curtailment of dwellings to those of the single-family variety bears a rational relationship to that stated purpose"). Further, denying the Variance Application—thus limiting future multi-family dwellings, which lead to a "higher population density" commercially "desired by businesses and other services"—is rationally related to those interests. (Comprehensive Plan, PAGEID # 516); *see White Oak*, 606 F.3d at 853.

The Court grants summary judgment to the Township on Plaintiffs' Equal Protection Claim (Count III).

### 2. Substantive Due Process Claim (Count II)

The Constitution protects individuals from government deprivation of certain liberty and property interests without due process of law. U.S. Const. amend. XIV. "[C]itizens have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1217 (6th Cir. 1992) (citing *Arlington Heights*, 429 U.S. at 263)). "[S]ubstantive due-process claims raised in the context of zoning regulations require a plaintiff to show that (1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action." *EJS Properties*, 698 F.3d at 855 (internal quotation marks and citation omitted).

In this case, Plaintiffs' substantive due process challenge fails because they did not have a protected property or liberty interest in building multi-family housing on the Property, and even if such interest did exist, the Township's actions were rationally related to a legitimate government interest.

### a) Plaintiffs lack a protected interest in the use variance.

Plaintiffs contend that the Township's zoning of the Property and denial of their Variance Application deprived them of their liberty and property interests in violation of their substantive due process rights. (Compl. ¶¶ 52, 57.) To succeed, Plaintiffs must demonstrate that they had a protected interest in a use variance on

25

the Property. *See Silver*, 966 F.2d at 1036. A plaintiff has a property interest in a benefit if they have a "legitimate claim of entitlement to it," rather than merely "an abstract need or desire for it" or a "unilateral expectation of it." *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008). A plaintiff has a liberty interest in a benefit if they have a "justifiable expectation" of it. *G.M. Engineers & Assocs., Inc. v. W. Bloomfield Twp.*, 922 F.2d 328, 331 (6th Cir. 1990) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983)).

A party cannot possess an interest in the receipt of a benefit "when the state's decision to award or withhold the benefit is wholly discretionary." *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002) (citation omitted); *see also Braun*, 519 F.3d at 573 (internal quotation marks and citation omitted) ("[T]o establish a property right in a future, rezoned land use, an individual must point to some policy, law, or mutually explicit understanding that both confers the benefit[] and limits the discretion of the City to rescind the benefit."). In other words, if the government "has unconstrained discretion to deny the benefit, a prospective recipient of that benefit can establish no more than a 'unilateral expectation' to it." *Med Corp.*, 296 F.3d at 410 (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972)). Therefore, to show a legitimate claim of entitlement to or a justifiable expectation of a use variance, Plaintiffs must demonstrate that the Township lacked discretion to deny Plaintiffs' proposed variance if Plaintiffs complied with certain minimum, mandatory requirements. *Silver*, 966 F.2d at 1036 (citing *G.M. Engineers,* 922 F.2d at 331).

A review of the Resolution confirms that the BZA had discretion to deny Plaintiffs' requested variance. The BZA "*may* authorize … such use variances from the terms of this resolution[.]" (Resolution, § 513, PAGEID # 217 (emphasis added).) The use of the word "may" in a zoning regulation allows sufficient discretion to a zoning board, even if a petitioner complies with the minimum requirements. *Triomphe Investors v. City of Northwood*, 49 F.3d 198, 203 (6th Cir. 1995). Because the BZA has broad discretion, Plaintiffs failed to show a "legitimate claim of entitlement" to a use variance or a "justifiable expectation" that the Township would allow Plaintiffs' desired use. *See also Silver*, 966 F.2d at 1036 (landowner had no property right for due process claim where board had discretion to deny zoning permit).

In an effort to distinguish this case from the above-cited case law, Plaintiffs argue that their "constitutionally protected property interests in this case are several." Their efforts are unavailing. First, Plaintiffs call on their "right to develop their property free from racial discrimination." (Resp., PAGEID # 639.) Even if this were a sufficient interest, as explained above, Plaintiffs have not shown that the Township engaged in discriminatory zoning practices.

Second, Plaintiffs allude to their "right to have any application they file decided on its merits, not on a feigned lack of authority to grant the relief requested." (Resp., PAGEID # 639.) Yet, as mentioned previously, Plaintiffs have not demonstrated any "feigned lack of authority" on the BZA's part. Courts apply a "deferential standard" when reviewing zoning decisions. *Pearson*, 961 F.2d at 1222.

A plaintiff must allege a degree of arbitrariness that amounts to "extreme irrationality." *Id*. An entity does not act with "extreme irrationality" if there is evidence in the record that supplies a reason why it "might have" taken the action it did. *Curto v. City of Harper Woods*, 954 F.2d 1237, 1243 (6th Cir. 1992). The BZA Minutes identify rational reasons why the BZA denied the Variance Application. (BZA Minutes, PAGEID # 597–98.) There is no "extreme irrationality" here.

Third, Plaintiffs point to their "right to have the variance approved if they meet the criteria." This right, however, is non-existent, as the Resolution gives the BZA discretion to deny use variances even if the undue hardship standard is met. (Resolution, § 513, PAGEID # 217.)

Accordingly, Plaintiffs have no liberty or property interest upon which to base their substantive due process claim.

> **b)     The Township's actions were rationally related to a legitimate government interest.**

Even if Plaintiffs could establish that they had a protected property or liberty interest, a zoning decision that bears "a rational relationship" with "a legitimate governmental purpose" still "survives a substantive due process challenge[.]" *Richardson v. Twp. of Brady*, 218 F.3d 508, 512–13 (6th Cir. 2000). As discussed above, the Township's denial of the Variance Application was rationally related to legitimate interests.

The Township is entitled to summary judgment on Count II.

### 3.  Regulatory and Due Process Takings Claims (Counts IV and V)

Plaintiffs allege that by denying them the opportunity to construct the Development on the Property, the Township committed (1) a taking without just compensation under the Fifth Amendment Takings Clause; and (2) a taking that destroyed the value of the Property to such an extent that it amounts to a taking by eminent domain without due process of law. (Compl. ¶¶ 74, 77, 80.) Neither of these claims have merit.

The Takings Clause of the Fifth Amendment, made applicable to state governments through the Fourteenth Amendment, provides that "private property shall not 'be taken for public use, without just compensation." *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017) (internal quotations and citations omitted). A "regulatory taking" concerns land-use regulations. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123–24 (1978) (quoting *Armstrong v. U.S.*, 364 U.S. 40, 49 (1960)). Similarly, a due process takings action "exists where a zoning regulation destroys the value of the plaintiff's property so that it 'amounts to a taking by eminent domain without due process of law.'" *Tri-Corp Management Co. v. Praznik*, 33 F. App'x 742, 747 (6th Cir. 2002) (quoting *Pearson*, 961 F.2d at 1215–16). "[A] governmental entity violates due process and creates a due process takings claim only when its regulation is equivalent to an appropriation of property through eminent domain or physical possession." *Id.*

Neither a regulatory takings claim nor a due process takings claim can proceed without a valid property interest. *McCarthy v. Middle Tenn. Elec.*

*Membership Corp.*, 466 F.3d 399, 412 (6th Cir. 2006). However, the property rights protected by takings law are broader than (or at least not coextensive with) the property rights protected by due process. *See, e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005). Although the Court has concluded that Plaintiffs do not have a protected interest for their substantive due process claim, the Court "cannot rely on due-process caselaw" to determine whether Plaintiffs have "a property interest that supports [their] takings claim." *Andrews, Tr. of Gloria M. Andrews Tr. Dated Apr. 23, 1998 v. City of Mentor, Ohio*, 11 F.4th 462, 469 (6th Cir. 2021).

In the takings context, "the deprivation of the right to use property for a particular purpose is not a 'taking' if that right was never a part of the titleholder's bundle of rights to begin with." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027 (1992); *Andrews*, 11 F.4th at 472. It is undisputed that the Property has been zoned in the GB-1 District since 1960, well before Plaintiffs acquired it in 2009. (Singleton Aff., PAGEID # 172–74; Resp., PAGEID # 640.) Plaintiffs may request a use variance (as they did in this case), but this is not granted as of right. When Plaintiffs purchased the Property, its bundle of rights did not include the right they now claim has been taken from them. Therefore, under *Lucas* and *Andrews*, the Township's denial of the Variance Application was not a taking. *See, e.g.*, *Skilwies v. City of Huber Heights*, No. 3:23-cv-146, 2023 WL 5619048, at *8 (S.D. Ohio Aug. 31, 2023) (Rice, J.).

Even assuming there was a valid property interest, the Township's denial of the Variance Application still does not constitute a regulatory or due process taking.

### a)    Regulatory Takings Claim

Regulatory takings claims generally fall into two categories. A total (or categorical) regulatory taking is one that allows the property owner "*no* productive or economically beneficial use of land" and entitles the property owner to just compensation under the Fifth Amendment. *Lucas*, 505 U.S. at 1019 (emphasis in original). A partial (or non-categorical) regulatory taking is a less intrusive regulation that prevents the property owner from some, but not all, economic use of his land. *Id*.

### (1)    Total Regulatory Taking

The Township refers the Court to the Resolution in arguing that the Property has not been deprived of all economic value. (Mot, PAGEID # 170.) Under the Resolution, the GB-1 classification of the Property clearly provides hundreds of "permitted uses," including manufacturing, retail, food services, healthcare, and countless others. (Resolution, § 907.B, PAGEID # 255–264.) Plaintiffs seek to avoid this fact by arguing that "[t]he only testimony in the record, however, established that their property is simply not suited for economically viable *commercial* use." (Resp., PAGEID # 641 (emphasis added).) The standard for a total regulatory taking is whether the regulation denies *all* economically beneficial or productive use of land. *Lucas*, 505 U.S. at 1016. Because the Property may be used for other purposes (including its current use as a single-family residence), the zoning restrictions on the Property do not deny Plaintiffs of all economically viable use of their land.

31

## (2) Partial Regulatory Taking

Nor has there been a partial taking here. The Court's inquiry focuses "upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 540. "[C]ourts employ an 'ad hoc, factual inquiry' into three significant factors" when a party alleges the presence of a partial taking: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Coalition for Gov't Procurement*, 365 F.3d 435, 483 (6th Cir. 2004) (citing *Raceway Park, Inc. v. Ohio*, 356 F.3d 677, 684 (6th Cir. 2004), and *Pa. Central*, 438 U.S. at 124).

Initially, Plaintiffs argue that the economic impact of the existing zoning and the Township's actions has been "detrimental" to them because they "made substantial expenditures in efforts to develop the Property." (Compl. ¶¶ 55, 73.) Nowhere do they substantiate this assertion. Their discovery responses state simply that their "expenditures include professional architectural fees, engineering fees, attorney's fees, and lost opportunities" and that they "engaged the services of a Broker" as a source of financing for the Development. (Resp., Ex. 1, PAGEID # 652.) Thus, Plaintiffs have not shown "sufficient probative evidence that would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy." *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004).

Next, a reasonable investment-backed expectation "must be more than a unilateral expectation or an abstract need." *Ruckelshaus v. Monsanto Co.*, 467 U.S.

986, 1005–06 (1984) (internal quotations and citation omitted). Here, Plaintiffs' expectation was merely unilateral and abstract—the GB-1 classification does not permit multi-family residential development, and the Township had discretion to deny the Variance Application. *See, e.g.*, *Raceway Park*, 356 F.3d at 685 (statute did not interfere with reasonable investment-backed expectations in part because plaintiff racetrack owners "were well aware" of allocation and distribution scheme "prior to making any investments").

Finally, "the character of the governmental action depends both on whether the government has legitimized a physical occupation of the property and whether the regulation has a legitimate public purpose." *Coal. for Gov't Procurement*, 365 at 483 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35, (1982), and *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 485 (1987)). There are no allegations of physical occupation of the Property, and the Township has legitimate objectives for its zoning actions. This factor, like the others, weighs against finding a partial taking, and the Township is entitled to summary judgment on Count IV.

### b)      Due Process Takings Claim

Like their substantive due process claims, Plaintiffs' due process takings claim fails because they did not establish that the Township deprived them of a protected property interest. Plaintiffs lack a cognizable property interest for due process takings purposes on account of the discretionary nature of the Township's decisions. Summary judgment is granted to the Township on Count V.

### 4. Claims Under the Ohio Constitution (Count VI)

Plaintiffs' state-law claim stems from the same conduct underlying their federal takings claims. It is not clear from Plaintiffs' Complaint, however, if they are asserting a state-law due process takings claim or a state-law regulatory takings claim. This is not important because Plaintiffs fail under either avenue.

If Plaintiffs are pursuing a due process takings claim (which arises under Article I, Section 16 of the Ohio Constitution), the Ohio Supreme Court treats such claims as equivalent to their federal counterpart. *State v. Aalim*, 83 N.E.3d 883, 890 (Ohio 2017). As detailed above, Plaintiffs cannot prevail on their federal counterpart.

If Plaintiffs are pursuing a regulatory takings claim, Article I, Section 19 of the Ohio Constitution affords greater protection than the federal Takings Clause in certain instances of physical takings. *Compare Kelo v. City of New London, Conn.*, 545 U.S. 469 (2005) (holding that city's use of eminent domain power to take property for economic development satisfies "public use" requirement of federal Takings Clause), w*ith Norwood v. Horney*, 853 N.E.2d 1115 (2006) (finding economic or financial benefit alone insufficient to satisfy public-use requirement of Ohio Constitution). Because a physical taking is not at issue in this case, the analysis required to determine if a regulatory taking has occurred under the Ohio Constitution is the same analysis required to determine if a regulatory taking has occurred under the U.S. Constitution. *See McCarthy v. City of Cleveland*, 626 F.3d 280, 287 (6th Cir. 2010). As explained above, no taking has occurred.

The Township is entitled to summary judgment on Count VI.

34

### 5. Declaratory Judgment (Count VII)

The Township seeks dismissal of Plaintiffs' declaratory judgment claim. (Mot., PAGEID # 170.) Because Plaintiffs' declaratory relief relates to their claims on which the Court has awarded summary judgment to the Township, the Township's request for dismissal is well taken. *See, e.g.*, *Robbins Co. v. Herrenknecht Tunnelling Sys. USA, Inc.*, No. 5:13-cv-2113, 2014 WL 2735634, at *1 (N.D. Ohio June 16, 2014) ("In order for a court to possess subject matter jurisdiction in an action for declaratory judgment, there must exist an 'actual controversy.'").

### 6. Writ of Mandamus (Count VIII)

Finally, Plaintiffs seek a writ of mandamus ordering the Township to commence appropriation proceedings against the Property and/or to amend the Resolution to allow the Property to be developed for multi-family residential use. (Compl. ¶ 104.) For the Court to issue a writ of mandamus, Plaintiffs must establish: (1) they have a clear legal right to the requested relief; (2) the Township has a clear duty to perform the requested relief; and (3) there is no other adequate remedy in the ordinary course of the law. *Ohio ex rel. Faulkner v. City of Middletown*, No. 1:15-cv-122, 2016 WL 3855203, at *10 (S.D. Ohio July 15, 2016) (Black, J.), *aff'd sub nom.*, 688 F. App'x 377 (6th Cir. 2017) (citing *State ex rel. Ney v. Niehaus*, 515 N.E.2d 914 (Ohio 1987)).

Plaintiffs cannot prove that they have a clear legal right to a writ of mandamus. The Township's decision to grant a use variance is discretionary and dependent on the evidentiary presentation at the BZA hearing. Plaintiffs have not

shown a clear legal right to such a variance or a clear duty on the part of the Township to grant one. A writ of mandamus is therefore inappropriate.

## V. CONCLUSION

For the reasons expressed herein, the Township's Motion for Summary Judgment is **GRANTED** as to all claims.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison\
**SARAH D. MORRISON**\
**UNITED STATES DISTRICT JUDGE**